UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- X

SECURITIES AND EXCHANGE
COMMISSION,

               Plaintiff,

       - against -

TECUMSEH HOLDINGS CORP.,
TECUMSEH TRADEVEST LLC, S.B.
CANTOR & CO., INC., JOHN L.
MILLING, GERARD A. McCALLION,
ANTHONY M. PALOVCHIK, AND
DALE CARONE,

            Defendants.

---------------------------------------------------- X

**OPINION AND ORDER**

**03 Civ. 5490 (SAS)**



**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.  INTRODUCTION

      In 2003, the Securities and Exchange Commission ("SEC") filed this suit alleging securities violations by Tecumseh Holding Corporation ("Tecumseh"), Tecumseh Tradevest LLC, S.B. Cantor & Company ("Cantor"), John L. Milling, Gerard A. McCallion, Anthony M. Palovchick and Dale Carone. Six years later, the SEC has moved for summary judgment against Milling, who

proceeds *pro se*, on its non-scienter claims.  These claims allege that Milling

violated Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") and

that Milling aided and abetted a violation of Section 17(a) of the Securities

Exchange Act of 1934 ("Exchange Act").  For reasons to be discussed, the SEC's

motion is granted with respect to its Section 5 claim and denied with respect to its

Section 17 claim.  In addition, because the evidence before this Court is

insufficient to establish that Milling substantially aided an alleged violation of

Section 17, the SEC is directed to inform the Court if it intends to introduce any

other evidence that might create a genuine issue of material fact as to whether

Milling aided and abetted such a violation.

## II.    BACKGROUND

### A.    Tecumseh Holdings Corporation

In 2000, John Milling and Thomas Souran launched Tecumseh

Holdings Corporation ("Tecumseh") – a financial services firm formed, at least in

part, to engage in broker-dealer activities.[1]  From 2000 until April or July 2003,

Tecumseh raised at least ten million dollars by selling unregistered securities to

---

[1]    *See* Milling Rule 56.1 Statement ("Milling 56.1") ¶ 5.

approximately five hundred investors.[2]  These securities were marketed –

including by means of "a nationwide cold-calling campaign" – primarily through a

sales team in Tecumseh's California office.[3]

Throughout this litigation, Milling has maintained that he was

President, Chief Executive Officer, General Counsel and Director of Tecumseh for

the entire period during which these sales took place.[4]  Although Milling now

denies holding these positions,[5] it is undisputed that Milling played a prominent

role in the sale of Tecumseh securities.  Specifically, Milling drafted or reviewed

offering memoranda used to sell the unregistered securities,[6] authorized the

distribution of these memoranda to prospective investors,[7] and participated in

discussions regarding "matters pertaining to the sale of Tecumseh securities" and

---

[2]     *Compare* 6/22/09 Response to Plaintiff's First Set of Requests for
Admission to Defendant John L. Milling ("Milling Admissions"), Ex. A to
Declaration of Nancy A. Brown, Senior Trial Counsel in the New York Regional
Office of the SEC, in Support of Plaintiff's Motion for Partial Summary Judgment
("Brown Decl."), ¶¶ 7-8 (July) *with* Milling 56.1 ¶ 23 (April).

[3]     *See* Milling 56.1 ¶ 17.

[4]     *See* Milling Admissions ¶ 17.

[5]     *See* Milling 56.1 ¶ 1.

[6]     *See* Milling Admissions ¶¶ 12-13.

[7]     *See id.* ¶ 14

"the compliance oversight of . . . sales personnel."[8]

## B. S.B. Cantor & Company

In late 2001, Tecumseh attempted to acquire Cantor – a registered broker-dealer that has been a member of the National Association of Securities Dealers ("NASD") since 1971 – but was unable to do so when NASD refused to approve the acquisition.[9]  Nevertheless, Tecumseh and Cantor maintained a close relationship, and several of Tecumseh's California-based sales representatives ultimately became "associated" with Cantor.[10]  Despite this relationship, Cantor did not keep records of securities sales made by these representatives.[11]  While Milling admits that he was aware of this practice,[12] and acted as counsel for Cantor for thirty-five years,[13] he denies participating in Cantor's business operations in any other way.[14]

---

[8]     *Id.* ¶ 3.

[9]     *See id.* ¶¶ 6, 22, 24.

[10]    Milling 56.1 ¶ 21.

[11]    *See id.* ¶ 18.

[12]    *See id.* ¶ 19.

[13]    *See* 4/6/09 Answers to Plaintiff's First Set of Interrogatories, Ex. F to Brown Decl., ¶ 5(a).

[14]    *See id.*

## III.   APPLICABLE LAW

### A.   Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[15] "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law.'"[16]  "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[17]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."[18]  The non-moving party must do more than show that there

---

[15]   Fed. R. Civ. P. 56(c).

[16]   *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[17]   *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).

[18]   *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

is "'some metaphysical doubt as to the material facts,'"[19] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[20] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[21]

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor.[22] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[23] Summary judgment is therefore

---

[19]     *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[20]     *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 2d Cir. 2001)).

[21]     *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

[22]     *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50, 255).

[23]     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). *Accord Anderson*, 477 U.S. at 249.

"appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[24]

## B.    Section 5 of the Securities Act

The stated objective of the Securities Act, also entitled the "Truth in Securities Act,"[25] is to "provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sales thereof . . . ."[26]  The Securities Act accomplishes this objective by requiring, *inter alia*, that companies disclose important information about their offered securities through registration of those securities with the SEC, unless an exemption under the Act applies.[27]

Section 5 of the Securities Act prohibits issuers, underwriters and dealers[28] from selling or offering to sell unregistered securities.[29]  Section 5

---

[24]     *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).

[25]     *See AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 218 n.9 (2d Cir. 2000) (citing *United States Code Annotated, Popular Name Table for Acts of Congress* (1997)).

[26]     15 U.S.C. §§ 77a-77mm (preamble).

[27]     *See id.* § 77f.

[28]     *See id.* § 77(d)(1).

[29]     *See id.* § 77(e).

7

provides in relevant part:

> [u]nless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly . . . to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or . . . to offer to sell or offer to buy [such security] . . .[30]

"To prove a violation of Section 5 requires establishing three prima facie elements: (1) That the defendant directly or indirectly sold or offered to sell securities; (2) that no registration statement was in effect for the subject securities; and (3) that interstate means were used in connection with the offer or sale."[31] Liability does not require that the defendant actually passed title of the security. Any person who "engaged in steps necessary to the distribution" of the unregistered security is liable under Section 5.[32] Once a plaintiff has established a prima facie violation, "the defendant bears the burden of proving" the applicability

---

[30]    *Id.*

[31]    *Sec. and Exch. Comm'n v. Universal Exp., Inc.*, 475 F. Supp. 2d 412 (S.D.N.Y. 2007) (Lynch, J.) (citing *Europe and Oversees Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 124 n.4 (2d Cir. 1998); *Sec. and Exch. Comm'n v.North Am. Research & Dev't Corp.*, 424 F.2d 63, 65 n.1 (2d Cir. 1970)). *Accord Sec. and Exch. Comm'n v.Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006).

[32]    *Sec. and Exch. Comm'n v.Chinese Consol. Benev. Ass'n, Inc.*, 120 F.2d 738, 741 (2d Cir. 1941).

8

of an SEC regulation exempting the security from registration.[33]

### C.   Section 17(a) of the Exchange Act

The intended purpose of the Exchange Act is "principally to protect

investors against manipulation of stock prices through regulation of transactions

upon securities exchanges and in over-the-counter markets."[34]  Section 17(a) aids

the SEC in achieving this goal by giving it the power to establish record keeping

requirements for registered broker-dealers and other entities associated with the

sale of securities.  It states in relevant part:

> Every . . . registered broker or dealer . . . shall make and keep for
> prescribed periods such records, furnish such copies thereof, and
> make and disseminate such reports as the Commission, by rule,
> prescribes as necessary or appropriate in the public interest, for
> the protection of investors, or otherwise in furtherance of the
> purposes of this chapter.[35]

The SEC has listed the specific records that must be kept in Rule 17a-3.[36]  It

requires registered broker-dealers to keep a broad array of records – including

"[b]lotters (or other records of original entry) containing an itemized daily record

---

[33]     *Cavanagh*, 445 F.3d at 111 n.13 (citing *Sec. and Exch. Comm'n v.Ralston Purina Co.*, 346 U.S. 119 (1953)).

[34]     *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976).

[35]     15 U.S.C. § 78q(a).

[36]     *See* 17 C.F.R. § 240.17a-3.

9

of all purchases and sales of securities, all receipts and deliveries of securities . . . ,
all receipts and disbursements of cash and all other debits and credits."[37]  Rule
17a-4 establishes the time periods for which the records required under Rule 17a-3
must be maintained.[38]

      In addition, the SEC is expressly authorized by statute to bring
enforcement actions against "any person that knowingly provides substantial
assistance to another person in violation" of SEC regulations such as those
established by Rule 17a-3 and 17a-4.[39]  The Second Circuit requires the SEC to
prove three elements to establish aiding and abetting liability: "'(1) the existence
of a securities law violation by the primary (as opposed to the aiding and abetting)
party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3)
'substantial assistance' by the aider and abettor in the achievement of the primary
violation.'"[40]

## IV.   DISCUSSION

---

[37]    *Id.* at § 240.17a-3(a)(1).

[38]    *See id.* § 240.17a-4.

[39]    15 U.S.C. § 78t(e).

[40]    *Sec. and Exch. Comm'n v.Pentagon Capital Mgmt. PLC*, 612 F. Supp.
2d 241, 266 (S.D.N.Y. 2009) (quoting *IIT v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.
2008)) (other citations omitted).

## A.    Section 5

Milling admits to the prima facie elements of a Section 5 violation.  It is undisputed that Tecumseh, from its inception until July 2003, raised at least ten million dollars from approximately five hundred investors through unregistered securities offerings,[41] and that these securities were sold "through a nationwide cold-calling campaign, using the telephone and other instrumentalities of interstate commerce."[42]  In the course of this litigation, Milling also stipulated on more than one occasion that he was President, Chief Executive Officer, General Counsel and a Director of Tecumseh during the period of these offerings.[43]  While Milling now denies that he held these positions,[44] he does not dispute previous admissions that he drafted or reviewed offering memoranda used to sell Tecumseh securities,[45] authorized the distribution of these memoranda to prospective investors,[46] and

---

[41]    *Compare* Milling Admissions ¶¶ 7-8 (July) *with* Milling 56.1 ¶ 23.

[42]    SEC's Rule 56.1 Statement ¶ 17.  *Cf.* Milling 56.1 ¶ 17.

[43]    *See* Milling Admissions ¶ 1.; Answer of Defendant John Milling ("Answer") (omitting denial of the SEC's allegations regarding positions Milling held at Tecumseh).

[44]    *See* Milling 56.1 ¶ 1.

[45]    *See* Milling Admissions ¶¶ 12-13.

[46]    *See id.* ¶ 14

11

participated in conversations regarding "matters pertaining to the sale of

Tecumeseh securities" and "the compliance oversight of . . . sales personnel."[47]

These undisputed facts are sufficient to establish that Milling "engaged in steps

necessary to the distribution" of unregistered Tecumseh securities.[48]

Because the SEC has established a prima facie violation of Section 5,

Milling must prove that the Tecumseh securities were exempted from registration

to avoid liability.  Although Milling does not identify the exact regulation under

which the securities at issue were exempt, he does assert that an exemption

applies.[49]  Most plausibly, Milling's argument is that the securities were exempted

by Regulation D – which contains various exemptions for certain limited securities

offerings.[50]  However, a security cannot be exempted from registration under

Regulation D if the offeror, in violation of Rule 502(c), engages in "any form of

general solicitation or general advertising."[51]   The SEC has made two factual

allegations suggesting that the Tecumseh sales team used forms of general

---

[47]     *Id.* ¶ 3.

[48]     *Chinese Consol. Benev. Ass'n, Inc.*, 120 F.2d at 741.

[49]     *See* Milling 56.1 ¶ 13.

[50]     *See, e.g.*, 17 C.F.R. § 230.505 (exempting offers for up to five million dollars sold to a limited number of purchasers).

[51]     *Id.* at § 230.502(c).

12

solicitation. While Milling has denied the SEC's allegation that Tecumseh used lead sheets to identify prospective investors,[52] Milling has neither denied[53] nor provided any evidence to rebut the SEC's allegation that Tecumseh sold securities through a nationwide cold-calling campaign.[54] Because a nationwide cold-calling campaign constitutes a form of general solicitation for purposes of Rule 502(c), the Tecumseh securities were ineligible to qualify for an exemption under Regulation D.

The language of Rule 502(c) is broad. It precludes the applicability of an exemption if the offeror engaged in "*any form* of general solicitation or general advertising."[55] In addition, while Rule 502(c) lists certain examples that constitute a form of general solicitation or advertising – *e.g.*, "any advertisement . . . published in any newspaper"[56] – it does not limit the scope of the Rule to those

---

[52]    *See* Milling 56.1 ¶ 17.

[53]    *See id.*

[54]    *See* 9/30/09 Declaration of Larry N. Chase, a 66 year-old man living in Valrico, Florida, 9/30/09 Declaration of Robert M. Kearns, a 76 year-old man living in Anderson, Indiana, and 10/6/09 Declaration of Nelson Bingham, a 63-year-old man living in Oakland, Iowa, Ex. G to Brown Decl. (describing cold-calls concerning Tecumseh securities the declarants received from Tecumseh salesman).

[55]    17 C.F.R. § 230.502(c) (emphasis added).

[56]    *Id.* § 230.502(c)(1).

examples.[57]  A nationwide cold-calling campaign has many of the same

characteristics as the examples listed in 502(c): (1) it has the potential to reach a

large number of people; (2) it has the potential to reach people throughout a large

geographic area; and, perhaps most importantly, (3) it generally targets people

with whom the issuer does not have a prior relationship and who are unlikely to

have any special knowledge about the offered security.  These similarities are

sufficient to support my determination that the cold-calling campaign constituted a

form of general solicitation precluding the Tecumseh securities from qualifying

for a Regulation D exemption.[58]

          Accordingly, the SEC's motion for summary judgment with respect to

its claim that Milling violated Section 5 is granted.

**B.     Section 17(a)**

          The SEC alleges that Milling is liable for aiding and abetting Cantor's

failure to record sales of Tecumseh securities made by salesman "associated with

---

[57]      *See id.* § 230.502(c).

[58]      *Cf. Sec. and Exch. Comm'n v.Rabinovich & Assoc., LP*, No. 07 Civ.
10547, 2008 Wl 4937360, at *4 (S.D.N.Y. Nov. 18, 2008) (Lynch, J.) (noting that
a defendant could not have asserted that the offered securities were exempt from
registration because the applicability of such an exception was precluded by the
"general solicitation of purchases by means of cold calls to prospective investors
and a website available to the general public").

Cantor."[59]  While it may be true that Cantor violated Section 17(a) of the

Exchange Act by failing to record these securities transactions, and that Milling

knew of these violations, the SEC has failed to establish that Milling substantially

assisted Cantor's violation.  The SEC makes two arguments in support of its claim

that Milling provided the requisite substantial assistance to establish aiding and

abetting liability.

*First*, the SEC reiterates that "Milling authorized the California office

to distribute the Tecumseh offering memoranda to prospective investors, even

though he knew they were associated with Cantor."[60]  As already discussed,

Milling's distribution of offering memoranda goes to establishing Milling's

liability for the sale of unregistered Tecumseh securities.  However, aiding in the

*sale* of a security does not make a person liable for aiding in a failure to *record*

that sale.[61]  Without some indication that Milling substantially aided Cantor's

failure to record the sale of the Tecumseh securities, Milling cannot be held

---

[59]     Memorandum of Law in Support of Plaintiff's Motion for Partial
Summary Judgment ("SEC Mem.") at 11.

[60]     *Id.* at 12.

[61]     *See Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d
478 (2d Cir. 1979) (holding that a bank employee who aided in a defrauder's
short-selling of securities was not liable for the defrauder's failure to tell a
brokerage firm, in violation of Rule 10b-5, that it was short-selling).

secondarily liable for those acts.

Second, the SEC claims that Milling, "in acting as counsel to Cantor in connection with [an earlier investigation by NASD] into Cantor's compliance with record keeping and authorization requirements[,] . . . should have advised Cantor to record the transactions, but instead did nothing to ensure that Cantor was in compliance with the requirements."[62]  However, it is well-established in the Second Circuit that "mere awareness and approval of [a] primary violation is insufficient to make out a claim for substantial assistance."[63]  Inaction is only sufficient if "'it was designed intentionally to aid the primary fraud or it was in conscious or reckless violation of a duty to act.'"[64] The SEC has neither alleged, nor introduced any evidence supporting an inference, that Milling's failure to advise Cantor to record the transactions at issue meets either of these requirements.

Accordingly, the SEC's motion for summary judgment with respect to its claim that Milling aided and abetted a violation of Section 17(a) of the

---

[62]     SEC Mem. at 12.

[63]     *Sec. and Exch. Comm'n v. Treadway*, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006) (citing *Amstrong v. McAlpin*, 699 F.2d 79, 92 (2d Cir. 1983)).

[64]     *Id.* (quoting *Armstrong*, 699 F.2d at 91).

Exchange Act is denied.[65]  In addition, because I find the evidence before this

Court insufficient to establish that Milling substantially aided Cantor's alleged

violation of Section 17(a), the SEC is directed to inform the Court if it has any

additional evidence to submit that would create a genuine issue of material fact as

to whether Milling aided and abetted a violation of Section 17(a).  If the SEC is

unable to produce any such evidence, I intend to grant summary judgment on this

claim in favor of Milling.[66]

## C.   Damages

### 1.   Injunctive Relief

The SEC has requested injunctive relief enjoining Milling from

engaging in future violations of the securities laws.[67]  "Except for . . . case[s]

---

[65]      In conjunction with its Section 17(a) claim, the SEC also argues that Cantor violated rules promulgated by the NASD, and that Milling aided and abetted that violation. *See* SEC Mem. at 12. Because the NASD claim is based on the same factual allegations as the Section 17(a) claim, summary judgment as to the NASD claim is likewise denied.

[66]      *See Bridgeway Corp. v. Citibank*, 201 F.3d 134, 139 (2d Cir. 2000) ("District courts are well advised to give clear and express notice before granting summary judgment *sua sponte*, even against parties who have themselves moved for summary judgment. The provision of such notice requires relatively little time or effort, and it permits appellate courts much more readily to determine – as they are required to do – whether the absence of a cross motion affected the result.").

[67]      *See* SEC Mem. at 12-14.

where the SEC steps in to prevent an ongoing violation,"[68] the SEC can only

obtain injunctive relief if a district court determines that there is a "reasonable

likelihood of recurrence."[69]  District courts – which have "broad discretion" to

award or deny injunctive relief –[70] consider a "totality of the circumstances" in

making this determination.[71]

   Almost all of the factors in this case point to a finding that there is a

reasonable likelihood that Milling will violate securities laws in the future if not

enjoined.  Milling played a central role in the sale of the unregistered Tecumseh

securities and engaged in the prohibited conduct on a recurring basis over a period

of at least three years.[72]  Moreover, and perhaps most importantly, this is not the

---

[68] *Sec. and Exch. Comm'n v.Commonwealth Chem. Sec., Inc., et al.*, 574
F.2d 90, 99 (2d Cir. 1978).

[69] *Sec. and Exch. Comm'n v.Parklane Hosiery Co., Inc.*, 558 F.2d 1083,
1089 (2d Cir. 1977) (citations omitted).

[70] *Id.* at 1090.

[71] *Sec. and Exch. Comm'n v.Lorin*, 76 F.3d 458, 461 (2d Cir. 1996)
(quotation marks and citations omitted).

[72] *See* Milling 56.1 ¶ 12. *See also Lorin*, 76 F.3d at 461 ("We have
noted that "'[w]hen the violation has been founded on systematic wrongdoing,
rather than an isolated occurrence, a court should be more willing to enjoin future
misconduct."' (quoting *United States v. Carson*, 52 F.3d 1173, 1184 (2d Cir.
1995))).

first time that Milling has violated the securities laws; he is a recidivist.[73]

Weighing these factors, I conclude that injunctive relief is appropriate in this case.

### 2. Disgorgement

The SEC has also requested that Milling be held joint and severally

liable with Tecumseh for the funds that were raised through the sale of the

unregistered securities, and that Milling be ordered to disgorge these ill-gotten

gains plus pre-judgment interest.[74] Courts may impose joint and several liability

where two or more defendants have collaborated in the illegal conduct at issue.[75]

Disgorgement is an equitable remedy used "to prevent wrongdoers from unjustly

enriching themselves through violations."[76] "The remedy consists of factfinding

by a district court to determine the amount of money acquired through wrongdoing

– a process sometimes called 'accounting' – and an order compelling the

---

[73]     *See* Milling 56.1 ¶ 4.

[74]     *See* SEC Mem. at 14-16.

[75]     *See Sec. and Exch. Comm'n v.AbsoluteFuture.com*, 393 F.3d 94, 97
(2d Cir. 2004). *Accord Sec. and Exch. Comm'n v.Calvo*, 378 F.3d 1211, 1215
(11th Cir. 2004) ("It is a well settled principle that joint and several liability is
appropriate in securities laws cases where two or more individuals or entities have
close relationships in engaging in illegal conduct.") (citations omitted).

[76]     *Cavanagh*, 445 F.3d at 117.

wrongdoer to pay that amount plus interest to the court."[77]  "Because the remedy is remedial rather than punitive, the court may not order disgorgement above this amount."[78]

Because Milling was a founder of Tecumseh, and played a principal role both in running that company and in orchestrating the unregistered securities offerings, it is appropriate for this Court to hold him jointly and severally liable with Tecumseh for the disgorgement of the funds that were raised from those offerings.  Milling admits that "at least $10 million [was] raised between April 2000 (when Tecumseh commenced sales of its securities) and April 2003 (when Tecumseh ceased all sales of its securities)."[79]  Furthermore, he agrees with the SEC's calculation that, "subtracting the amounts returned to investors, the assets marshaled by the receiver, and the proceeds of the prior settlements," approximately $7,200,000 is still owed to investors.[80]

The SEC requests that I order the disgorgement of the $7,200,000 plus pre-judgment interest.  I agree that Milling should be ordered to disgorge

---

[77]    *Id.* at 116.

[78]    *Id.* at 117 n.25 (citations omitted).

[79]    Milling 56.1 ¶ 23.

[80]    *Id.* ¶ 24

these ill-gotten gains, and that it is appropriate to include interest from the date

Tecumseh received the proceeds of the securities sales through the date of

judgment.[81]  However, I am presently unable to calculate that interest.  According

to the SEC, the ill-gotten funds were apparently raised through a series of

securities offerings.[82]  While the total amount of these three offerings is

undisputed, no evidence has yet been introduced to show how much money was

received from each offering.  Without this information it is impossible to calculate

the interest owed by Milling from the dates Tecumseh received the proceeds of the

securities sales.  Accordingly, the SEC is directed to supply this information to the

Court, as well as to Milling, so that he has an opportunity to respond.

### 3.    Civil Penalties

The SEC also requests that I impose "first-tier" civil penalties for

Milling's non-scienter claims.[83]  "Civil Penalties are designed to punish the

---

[81]    *See Sec. and Exch. Comm'n v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998)
(holding that it is appropriate for a court to impose pre-judgment interest even
where the SEC may have been at fault for delaying the initiation of a civil action
and subsequent judgment on the merits).

[82]    *See* SEC Complaint ¶ 24.

[83]    *See* SEC Mem. at 16-17.

21

individual violator and deter future violations of securities laws."[84]  Courts look to

a number of factors in determining whether to impose civil penalties, including,

> (1) the egregiousness of the defendant's conduct; (2) the degree
> of the defendant's scienter; (3) whether the defendant's conduct
> created substantial losses or the risk of substantial losses to other
> persons; (4) whether the defendant's conduct was isolated or
> recurrent; and (5) whether the penalty should be reduced due to
> the defendant's demonstrated current and future financial
> condition.[85]

First Tier civil penalties cannot exceed the greater of $6,500 per violation for a

natural person[86] or "the gross amount of pecuniary gain to such defendant as a

result of the violation."[87]

The SEC has not provided any evidence of the total amount of

pecuniary gain Milling personally received from the sale of unregistered

securities.  In any event, because Milling has already been held jointly and

severally liable for the entire amount of Tecumseh's ill-gotten gains, and because

of his advanced age and deteriorating health, a civil fine of $6,500 is adequate to

punish Milling and deter future violations.  The imposition of a civil penalty is

---

[84]    *Sec. and Exch. Comm'n v.Opulentica, LLC*, 479 F. Supp. 2d 319, 331
(S.D.N.Y. 2007) (citation omitted).

[85]    *Id.* (citations omitted).

[86]    *See* 15 U.S.C. § 77t(d)(2)(A) and 17 C.F.R. § 201.1001.

[87]    15 U.S.C. § 77t(d)(2)(A).

appropriate in this case because of Milling's central role in the sale of the unregistered securities and because the conduct at issue continued over a three-year period.

## IV. CONCLUSION

For the aforementioned reasons, the SEC's motion for summary judgment is granted with respect to its claim that Milling violated Section 5 and is denied with respect to its claim that Milling aided and abetted a violation of Section 17(a). Because the evidence before this Court is insufficient to demonstrate that Milling substantially aided Cantor's alleged violation of Section 17(a), the SEC is directed to inform the Court if it intends to introduce any other evidence in support of its claim that Milling should be held liable for aiding and abetting a violation of Section 17(a). The SEC is also directed to introduce evidence demonstrating when Tecumseh received funds from each of its offerings so that this Court can determine the pre-judgment interest owed by Milling, and to notify Milling of the submitted evidence so that he has an opportunity to respond. The Clerk of Court is directed to close this motion (Docket No. 93).

SO ORDERED:

23

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            December 22, 2009

## - Appearances -

**For the SEC:**

Nancy A Brown, Esq.
Securities & Exchange Commission
3 World Financial Center, Room 4300
New York, NY 10281
Tel: (212) 336-1023
Fax: (212) 336-1322

**For Defendant (Pro Se):**

John L. Milling, Esq.
Milling Law Offices
115 River Road
Building 12, Suite 1205
Edgewater, NJ 07020
Tel: (201) 869-6900