UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

          - against -

TECUMSEH HOLDINGS CORP.,
TECUMSEH TRADEVEST LLC, S.B.
CANTOR & CO., INC., JOHN L.
MILLING, GERARD A. McCALLION,
ANTHONY M. PALOVCHIK, AND
DALE CARONE,

                    Defendants.

------------------------------------------------------ X

OPINION AND ORDER

03 Civ. 5490 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.      INTRODUCTION

          In 2003, the Securities and Exchange Commission ("SEC") filed this

suit alleging securities violations by Tecumseh Holding Corporation

("Tecumseh"), Tecumseh Tradevest LLC ("Tradevest"), S.B. Cantor & Company

("Cantor"), John L. Milling, Gerard A. McCallion, Anthony M. Palovchick and

Dale Carone.  In 2009, the SEC moved for partial summary judgment against

Milling, who proceeds *pro se*, on its non-scienter claims.  I granted the SEC's

1

motion with respect to its claim that Milling violated Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act"), but denied the motion with respect to the SEC's claim that Milling aided and abetted a violation of Section 17(a) of the Securities Exchange Act of 1934 ("Exchange Act").  I also enjoined Milling from engaging in future violations of the securities laws, ordered that Milling disgorge $7,200,000 in ill-gotten gains plus pre-judgment interest, and imposed "first-tier" civil penalties of $6,500.[1]

The SEC now moves for summary judgment against Milling on its First Claim for Relief (violations of Section 10(b) and Rule 10b-5 of the Exchange Act and Section 17(a) of the Securities Act (the "Antifraud Provisions")) and its Fifth Claim for Relief (aiding and abetting violations of Section 17(a) of the Exchange Act and Rules 17a-3 and 17a-4) ("aiding and abetting claim").[2]  The

---

[1]    *See SEC v. Tecumseh Holdings Corp.*, No. 03 Civ. 5490, 2009 WL 4975263 (S.D.N.Y. Dec. 22, 2009) ("*Tecumseh I*").  This decision assumes familiarity with the facts and legal standards laid out in that opinion.

[2]    I note that Milling's "opposition" to the SEC's motion consists of two unsigned submissions pertaining to the "First Claim for Relief" (twenty-three pages) and the "Fifth Claim for Relief" (four pages), each consisting of "commentary" and "extracts" from various Tecumseh Securities offering memoranda and National Association of Securities Dealers ("NASD") Rule 3040. *See* Defendant's Submission in Opposition to SEC's Motion for Summary Judgment on First Claim for Relief ("Def. Opp. to MSJ on First Claim"); Defendant's Submission in Opposition to SEC's Motion for Summary Judgment on Fifth Claim for Relief ("Def. Opp. to MSJ on Fifth Claim").

SEC also seeks an order enjoining Milling from future violations and imposing third-tier civil monetary penalties against him.  For the reasons stated below, the SEC's motion is granted with respect to its claim under the Antifraud Provisions; summary judgment is granted in favor of Milling with respect to the SEC's aiding and abetting claim; and Milling is enjoined from future violations and ordered to pay third-tier civil penalties of $110,000.

## II.   BACKGROUND[3]

### A.   The Fraudulent Offerings of Tecumseh Securities

Tecumseh's unregistered offerings consisted of Tecumseh Class A stock, Tecumseh Class C stock, and units of Tradevest (collectively, the "Tecumseh Securities").[4]  Tecumseh and the Tecumseh Securities were described

---

[3]   This section supplements the background section of *Tecumseh I* with additional undisputed facts pertaining to Milling's allegedly fraudulent misstatements and omissions in connection with the purchase, sale, and offer of Tecumseh Securities.  *See Tecumseh I*, 2009 WL 4975263, at *1.

[4]   *See* SEC's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("56.1") ¶ 13.  Milling served no counter-statement to the SEC's Rule 56.1 statement.  "A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."  *T.Y. v. New York City Dept. of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (*citing Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)).  *Accord* Local Rule 56.1(c)-(d).  "Pro se litigants are . . . not excused from meeting the requirements of Local Rule 56.1 . . . ."  *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (citing *Vermont Teddy Bear Co. v. 1-800-BEARGRAM Co.*, 373 F.3d 241, 246 (2d Cir. 2004)).  However, in opposition to the SEC's 2009 Motion for Partial Summary Judgment ("SEC PSJ

to prospective investors in eight offering memoranda dated June 20, 2000;

December 1, 2000; February 25, 2001; September 1, 2001; September 25, 2001;

March 5, 2002; November 1, 2002; and April 1, 2003.[5]  Milling drafted or

reviewed the offering memoranda used to sell the unregistered securities,[6]

authorized the distribution of these memoranda to prospective investors,[7] and

participated in discussions regarding "matters pertaining to the sale of Tecumseh

securities" and "the compliance oversight of . . . sales personnel."[8]

### 1.    Profit Projections

---

Mem.") (Docket No. 121) in this case, Milling submitted a response to the SEC's
Rule 56.1 Statement ("Milling PSJ 56.1").  *See* Exhibit A to 10/7/10 Declaration of
Linda L. Arnold in Support of the SEC's Motion for Summary Judgment ("Arnold
Decl.").  The Rule 56.1 Statement submitted by the SEC in support of its current
motion draws largely on the Milling PSJ 56.1 Statement, as well as Milling's
Amended Responses to the Commission's Requests for Admission dated May 22,
2009 ("Amended Admissions").  *See* Exhibit A to 10/8/09 Declaration of Nancy A.
Brown, submitted in support of the SEC's 2009 Motion for Partial Summary
Judgment ("Brown PSJ Decl.") (Docket No. 97).  Therefore, the SEC's Rule 56.1
statements of fact are deemed to be admitted only to the extent that they (1) are not
inconsistent with the Milling PSJ 56.1 Statement or the Amended Admissions and
(2) are followed by citations to evidence that would be admissible.  *See* Local Rule
56.1(d).

[5]    *See* 56.1 ¶14 (citing Amended Admissions ¶¶ 12-13; Milling PSJ 56.1
¶ 14).

[6]    *See id.* ¶ 3 (citing *Tecumseh I*, 2009 WL 4975263, at *3-4).

[7]    *See id.*

[8]    *Id.*

The September 1, 2001 offering memorandum for Tecumseh Class A Common Stock (the "September 2001 Class A Offering Mem.") announced that Tecumseh had "acquired ownership of [Cantor]."[9]  It contained the following three-year profit projections: net operating income (profits) of $8,296,350 in the first year, $12,470,200 in the second year, and $17,067,900 in the third year.[10] These projections were distributed to prospective investors from September 2001 through May or June 2003[11] and were incorporated by reference into the September 25, 2001, March 5, 2002, and November 1, 2002 offering memoranda, all of which pertained to offerings of Class C Common Stock.[12]  Subscription agreements

---

[9]      Exhibit B to Arnold Decl., at 2.

[10]     *See id.* at 53-54.

[11]     *See* 56.1 ¶ 18 (citing Amended Admissions ¶ 17).

[12]     *See* 9/25/01 Offering Memorandum for Tecumseh Class C Common Stock and Interests in Tradevest ("September 2001 Class C Offering Mem."), Exhibit C to Arnold Decl., at 1; 3/5/02 Amended Offering Memorandum for Tecumseh Class C Common Stock and Interests in Tradevest ("March 2002 Amended Class C Offering Mem."), Exhibit D to Arnold Decl., at 1; 11/1/02 Offering Memorandum for Tecumseh Class C Common Stock ("November 2002 Class C Offering Mem."), Exhibit E to Arnold Decl., at 1 (56.1 ¶ 19).
        Each of these memoranda referred prospective investors to the September 2001 Class A Offering Mem. for more information and stated that the information contained in each of the subsequent offering memoranda was "qualified" and "in all respects subject to" the September 2001 Class A Offering Mem.  *Id.*  According to the cover page of the September 2001 Class C Offering Mem. and March 2002 Amended Class C Offering Mem. a copy of the September 2001 Class A Offering Mem. was "provided to each investor in the securities

accompanying those memoranda required prospective investors to attest that they

had "received and carefully reviewed" the September 2001 Class A Offering

Mem.[13]

       At the time Tecumseh made these projections, both Tecumseh and

Cantor were operating at a loss.[14]  By 2003, neither Tecumseh nor Cantor,

separately or together, had come close to meeting these projections.[15]  Milling

---

offered hereby and accompanies this memorandum."  The November 2002 Class C
Offering Mem. stated that the September 2001 Class A Offering Mem. "may be
obtained from the company upon request."

[13]     Subscription Agreement for September 2001 Class C Offering Mem.,
Exhibit C to Arnold Decl., at Exhibit B, p. 1; Subscription Agreement for March
2002 Amended Class C Offering Mem., Exhibit D to Arnold Decl., at Exhibit B, p.
1; Subscription Agreement for November 2002 Class C Offering Mem., Exhibit E
to Arnold Decl., at Exhibit B, p. 1 (56.1 ¶ 20).

[14]     *See* Tecumseh's Statement of Operations as of September 30, 2002
("Tecumseh Statement of Operations"), Exhibit G to Arnold Decl., at 3 (showing
losses since inception) (56.1 ¶ 24); Cantor's Statement of Operations for the Year
Ended August 31, 2001, Exhibit F to Arnold Decl. (56.1 ¶ 22).

[15]     *See* Tecumseh Statement of Operations; Cantor's Statements of
Operations (56.1 ¶¶ 22-25).  Although Cantor realized a modest pre-tax profit of
$394,491 for its fiscal year ended August 31, 2000, it lost money continuously
thereafter, including during the almost two-year period after its affiliation with
Tecumseh.  *See* Cantor's Statements of Operations (56.1 ¶ 22).  Specifically,
Cantor incurred pre-tax losses of $945,754 and $852,657, respectively, during the
fiscal years ended August 31, 2001 and August 31, 2002, and a pre-tax loss of
$201,985 during the first two quarters of 2003.  *See id.* (56.1 ¶ 23).  Tecumseh's
total loss since inception was $4,190,603.  *See* Tecumseh Statement of Operations
at 3 (56.1 ¶ 24).  A footnote in Tecumseh's unaudited financial statements reflected
Tecumseh's accountant's concerns about Tecumseh's ability to continue as a going

knew that Cantor recorded only net operating losses after its fiscal 2000 year[16] and that Tecumseh had recorded only net operating losses.[17]  Those losses were never disclosed to investors, except to those who specifically inquired.[18]  In 2003, after regulatory inquiries by the SEC and the NASD had begun, Tecumseh disclosed to prospective investors in a new Class C offering memorandum – which no longer incorporated the projections contained in the September 2001 Class A Offering Mem. – that the company "has had net losses since its inception."[19]

### 2.    Dividends and Returns on Investment

The September 2001 Class C Offering Mem. stated that investors would receive quarterly payments "derived from the amount of Cantor net trading

---

concern: "[E]ven though current operations may be dependent on raising additional capital, the financial statements do not include any adjustments that might be necessary should the Company be unable to continue as a going concern."  *Id.* at 11 (56.1 ¶ 24).  Tecumseh recorded a $580,955 pre-tax loss for the three months ending March 2003.  *See* Pro Forma Combined Financial Statements of Cantor and Tecumseh as of March 31, 2003, Exhibit H to Arnold Decl., at 2 (56.1 ¶ 25).

[16]    *See* 56.1 ¶ 23 (citing Amended Admissions ¶ 5).

[17]    *See id.* ¶ 26 (citing Amended Admissions ¶ 4).

[18]    *See id.* (citing Amended Admissions ¶ 19 ("No direct reference was made to any operating losses of Cantor.")).

[19]    4/1/03 Offering Memorandum for Tecumseh Class C Common Stock ("April 2003 Class C Offering Mem."), Exhibit J to Arnold Decl., at 1 (56.1 ¶ 35).

7

profit."[20]  The March 2002 Amended Class C Offering Mem. changed this provision to read that investors would receive quarterly "ROI" (return on investment) distributions derived from the general funds of Tecumseh (to the extent distributions were not made from Cantor profits).[21]  It also explained that "the distributions to investors will not necessarily be indicative of trading profits of Cantor."[22]  Tecumseh made quarterly payments to Class C shareholders that were identified on the checks by which they were issued as "Dividend Payout[s]."[23] Milling signed the checks on behalf of Tecumseh.[24]  However, the source of Tecumseh's "dividends" was in fact investor capital or proceeds raised from more recent investors.[25]

In the April 2003 Class C Offering Mem., Tecumseh disclosed to

---

[20]     September 2001 Class C Offering Mem. at 4 (56.1 ¶ 29) ("[t]he [return on investment ("ROI")] of all investments, . . . with respect to the period subsequent to October 1, 2001, is intended to be derived from the amount of Cantor net trading profit, realized during the calendar quarter, and paid by Cantor to Tradevest as reimbursements and fees . . . .").

[21]     *See* March 2002 Amended Class C Offering Mem. at 4 (56.1 ¶ 30).

[22]     *Id.* at 2, 3.

[23]     *See* 10/29/02 Checks Paid to the Order of Frank Wong, Katina A. Wong, and Xerox Corporation from Tecumseh Holdings Corporation, Exhibit I to Arnold Decl. (56.1 ¶ 31).

[24]     *See id.*

[25]     *See* 56.1 ¶ 33 (citing Amended Admissions ¶ 20).

8

prospective investors that the company "has had net losses since its inception," reiterating that any quarterly "dividends" would not be "indicative of profits earned by the company."[26]  However, in a subsequent correspondence with existing investors, Milling continued to characterize the payments to investors as "dividends."[27]

### 3.    The Cantor Acquisition

NASD approval of the Cantor acquisition was a condition of Tecumseh's ability to legally operate Cantor as a wholly-owned subsidiary, a fact

---

[26]    April 2003 Class C Offering Mem., at 1 (56.1 ¶ 35).

[27]    *See* 7/11/03 Letter from John Milling to Tecumseh Class C Shareholders, Exhibit K to Arnold Decl. (56.1 ¶ 36) ("We are pleased to pay to you . . . the amount of 2% of your Investment in Tecumseh Holdings.  This *return* . . . amounts to an annualized *return* of 8% of your investment.  The amount of this *dividend* is the result of a lack of liquidity in the assets of Tecumseh.") (emphasis added).  The SEC alleges that Milling also "reflected the payouts as dividends rather than deductions from investor capital accounts on statements of capital accounts that Milling provided to" existing investors.  56.1 ¶ 36.  However, the documentary evidence it cites, a "Statement of Account" for Michael J. Murphy dated July 10, 2003, describes the payouts as "distributions," not dividends.  *See* Exhibit L to Arnold Decl.  Moreover, it states that "[t]he amount of the distribution made to the Class C Common Stockholders does not reflect the amount of trading profits realized during the trading quarter covered by this statement.  Rather, it represents an amount which reflects the sum to which the Class C Stockholders are fairly entitled."  *Id.*

contemplated by the August 2001 acquisition agreement[28] and known by Milling.[29]

In offering memoranda and Tecumseh newsletters, Milling repeatedly represented

to investors that NASD approval of the acquisition was "forthcoming."[30]

However, Milling did not submit a formal application to the NASD on Cantor's

behalf until May 9, 2003, almost two years after the 2001 acquisition agreement.[31]

As Tecumseh's general counsel, Milling was responsible for submitting the

application,[32] and expressly acknowledged in correspondence with the NASD in

---

[28]     *See* 56.1 ¶ 37 (citing Amended Admissions ¶ 6).

[29]     *See id.* ¶ 41 (citing 5/25/09 Milling Amended Interrogatory Responses
("Amended Interrogatory Responses"), Exhibit F to Brown PSJ Decl., ¶ 10(b)).

[30]     *See* September 2001 Class A Offering Mem. at 2 ("The [Cantor]
acquisition is subject to regulatory approval which is expected to be
forthcoming."); September 2001 Class C Offering Mem. at 3 ("After discussion
between Cantor and the NASD, the Companies believe that it is reasonably
improbable that such regulatory approval will not be forthcoming"); 12/7/01
Tecumseh Newsletter, Exhibit N to Arnold Decl., at 1 (NASD approval "is fully
expected to be granted without unusual conditions"); 5/10/01 Tecumseh
Newsletter, Exhibit M to Arnold Decl., at 2 ("Tecumseh believes that these NASD
approvals will be forthcoming."); March 2002 Amended Class C Offering Mem. at
2 ("After discussions between Cantor and NASDR, the Companies believe that it is
reasonably probable that such regulatory approval of such acquisition will be
forthcoming"); November 2002 Class C Offering Mem. at 2 ("Both Cantor and the
Company believe that it is reasonably probable that such regulatory approval of
such acquisition will be forthcoming.") (56.1 ¶ 38).

[31]     *See* Application of Cantor for Membership Continuance Under
Control of Tecumseh Holdings Corporation, Exhibit Q to Arnold Decl. (56.1 ¶ 45).

[32]     *See* 10/17/01 Letter from Milling to NASD, Exhibit B to Brown PSJ
Decl., at 1; 6/2/03 Letter from Milling to NASD, Exhibit H to Arnold Decl., at 1

2001 that an application under NASD Rule 1017 had not been submitted.[33]  Milling failed to disclose to investors that there was no application filed or pending with the NASD.[34]

## III.   APPLICABLE LAW

### A.   Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[35]  "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law.'"[36]  "[T]he burden of

---

(56.1 ¶ 39).

[33]   *See* 10/17/01 Letter from Milling to NASD at 2 ("Cantor intends, promptly . . . to file with the Association its application for a change in its ownership and control . . . .") (56.1 ¶ 42).  *See also* 11/12/01 Letter from Milling to NASD, Exhibit O to Arnold Decl., at 3 (telling the NASD that Cantor would file the application "within a matter of weeks") (56.1 ¶ 43); 11/16/01 Letter from Milling to NASD, Exhibit P to Arnold Decl. (responding to the NASD's having treated Milling's October 17, 2001 letter as an incomplete application under NASD Rule 1017 that the "application" was "withdrawn") (56.1 ¶ 44).

[34]   *See supra* note 30.

[35]   Fed. R. Civ. P. 56(c).

[36]   *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)).

demonstrating that no material fact exists lies with the moving party . . . ."[37]  In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor.[38]

### B.    The Antifraud Provisions

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit fraud in connection with the purchase or sale of any security.[39]  To prove a

---

[37]    *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008).

[38]    *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).  The SEC urges this Court to "draw all inferences available from the evidence submitted against Milling" because of his extensive assertion of the Fifth Amendment in his deposition on July 27, 2010.  *See* SEC's Memorandum of Law in Support of Motion for Summary Judgment ("SEC Mem.") at 21 (citing *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003)*,* for the proposition that a court may draw "a negative inference from [defendant's] assertion of her Fifth Amendment privilege.").  However, by asserting the Fifth Amendment in his deposition last July, Milling did not "den[y] discovery" to the SEC in this case.  *See Martino*, 255 F. Supp. 2d at 282 ("[L]itigants *denied discovery* based upon an assertion of the privilege may ask the court or trier of fact to draw a negative inference from the invocation of that right.") (emphasis added).  While Milling may not be a beacon of cooperation, he has supplied admissions, responses to interrogatories, and responses to the SEC's previously-submitted Rule 56.1 Statement.  *See* Amended Admissions; Amended Interrogatory Responses; Milling PSJ 56.1.  Moreover, those admissions and responses supply sufficient evidence on which to find him in violation of the Antifraud Provisions as a matter of law without my having to draw inferences *against* him.  Therefore, I need not, and do not, draw any inferences against Milling from his invocation of the Fifth Amendment.

[39]    *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

violation of these provisions, the Commission must establish that Milling "'(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the *purchase or sale* of securities.'"[40] "Essentially the same elements are required under Section 17(a)(1)-(3) in connection with the *offer or sale* of a security, though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)."[41]

"A statement or omission is material if 'there is a substantial likelihood that a reasonable shareholder would consider it important' or, in other words, 'there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable shareholder as having significantly altered the 'total mix' of information available.'"[42] Materiality "depends on the significance the reasonable investor would place on the withheld or misrepresented

---

[40]     *SEC. v. Ramoil Mgmt., Ltd.*, No. 01 Civ. 9057, 2007 WL 3146943, at *7 (S.D.N.Y. Oct. 25, 2007) (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)) (emphasis added).

[41]     *Monarch Funding Corp.*, 192 F.3d at 308 (citing *SEC v. First Jersey Sec.*, 101 F .3d 1450, 1467 (2d Cir. 1996)) (emphasis added).

[42]     *SEC v. DCI Telecomms., Inc.*, 122 F. Supp. 2d 495, 498 (S.D.N.Y. 2000) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988)).  *Accord ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

information."[43]  "The determination [of materiality] requires delicate assessments

of the inferences a 'reasonable shareholder' would draw from a given set of facts

and the significance of those inferences to him, and these assessments are

peculiarly ones for the trier of fact."[44]  "Only if the established omissions are so

obviously important to an investor, that reasonable minds cannot differ on the

question of materiality is the ultimate issue of materiality appropriately resolved as

a matter of law by summary judgment."[45]

      "The requisite state of mind in a section 10(b) and Rule 10b-5 action

is an intent 'to deceive, manipulate, or defraud.'"[46]  However, the Second Circuit

"has also long held that the scienter element can be satisfied by a strong showing

of reckless disregard for the truth."[47]  Conduct is reckless if it "'represents an

extreme departure from the standards of ordinary care to the extent that the danger

---

[43]     *Basic*, 485 U.S. at 240.

[44]     *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (U.S. 1976).

[45]     *Id.* (quotation marks and citation omitted).

[46]     *ECA*, 553 F.3d at 198 (quoting *Tellabs v. Makor Issues & Rights, Inc.*, 551 U.S. 308, 313 (2007)).

[47]     *South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009).  *Accord Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (citing *Novak v. Kasaks*, 216 F.3d 300, 308-09 (2d Cir. 2000)) ("In addition to actual intent, . . . recklessness is a sufficiently culpable mental state in the securities fraud context.").

14

was either known to the defendant or so obvious that the defendant must have been aware of it.'"[48]  Similarly, "evidence that the 'defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud,' and hence 'should have known that they were misrepresenting material facts'" constitutes a showing of recklessness.[49]

## IV.   DISCUSSION

### A.   The Antifraud Provisions

The SEC argues that Milling made misrepresentations in, and omitted material facts from, offering materials and other communications with investors concerning (1) Tecumseh's anticipated profits, (2) Tecumseh's dividends or returns on investment, and (3) the NASD's approval of Tecumseh's acquisition of Cantor.  The only *argument* Milling articulates in opposition is that he was not responsible for compliance and oversight of Tecumseh sales personnel.[50]  Leaving

---

[48]     *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39-40 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978)).

[49]     *South Cherry St.*, 573 F.3d at 109 (quoting *Novak*, 216 F.3d at 308).

[50]     *See* Def. Opp. to MSJ on First Claim at 1 (arguing that it is "both impossible and untrue" that he was responsible for such oversight because he "did not, and due to [his] need to be [in] New Jersey, could not spend any time in California while with Tecumseh"); *id.* ("Tecumseh . . . relied on Dale Carone to oversee, manage and enforce compliance by all company personnel . . . .").

aside for the moment that Milling's assertion is in direct contradiction to a

response he previously supplied to an SEC interrogatory,[51] it is also irrelevant to

the SEC's claim under the Antifraud Provisions.  Moreover, in the course of

making this argument, Milling admits that "[t]here were a number of instances in

which our compliance rules were violated, some of which were in the extreme,"

and that "[s]everal entailed oral and written statements which were preposterous" –

"[m]ost, *but by no means all*, were *not transmitted to prospective investors*."[52]  The

remainder of his submission consists of statements extracted from various offering

memoranda.  For the reasons stated below, the SEC's motion is granted.

### 1.   Material Misrepresentations and Omissions

#### a.   Profit Projections[53]

The SEC argues that the "baseless [profit] projections in Tecumseh's

offering memoranda are actionable under the antifraud provisions," citing *In re*

*Time Warner Inc. Securities Litigation* for the proposition that projections are "'not

---

[51]   *See* Amended Interrogatory Responses ¶ 10(b).

[52]   Def. Opp. to MSJ on First Claim at 1 (emphasis added).

[53]   The only offering memoranda at issue in this claim are the September 2001 Class A Offering Mem. and, by incorporation, the September 2001 Class C Offering Mem., March 2002 Amended Class C Offering Mem., and November 2002 Class C Offering Mem.

beyond the reach of the securities laws.'"[54]  Specifically, in the September 2001 Class A Offering Mem., Tecumseh projected profits of almost $8.3 million for the fiscal year ending August 31, 2002 – at a time when Tecumseh was operating at a loss and on the heels of Cantor's incurring pre-tax losses of $945,754 in the fiscal year that had just ended.  Neither the September 1, 2001, September 25, 2001, March 5, 2002, nor November 1, 2002 offering memoranda disclosed these losses to investors.  Nor at any time throughout the 2002 fiscal year did Tecumseh seek to amend its profit projections for that fiscal year (or for any other fiscal year) – despite the fact that (1) Cantor was on track to incur pre-tax losses of $852,657, (2) the September 2001 Class A Offering Mem. was incorporated by reference into all of the 2002 offering memoranda and distributed to investors, and (3) subscription agreements accompanying those memoranda required prospective investors to attest that they had "received and carefully reviewed" the September 2001 Class A Offering Mem.  The most disclosure Tecumseh ever provided with respect to the actual (and extreme) disconnect between its expected profits and its actual losses did not occur until April 1, 2003, when Tecumseh disclosed for the first time that it "has had net losses since its inception."[55]

---

[54]     SEC Mem. at 15 (quoting 9 F.3d 259, 266 (2d Cir. 1993)).

[55]     April 2003 Class C Amended Offering Mem. at 1.

Milling does not directly address the SEC's argument that the profit projections were false, instead suggesting that a series of disclaimers contained in the offering memoranda sufficiently qualified the profit projections.[56] "Such disclaimers, however, do not necessarily shield a defendant from liability . . . if plaintiffs [prove] facts demonstrating the defendant knew that such statements were false at the time they were made."[57] And here, the SEC argues that Milling –

---

[56]  *See, e.g.*, Def. Opp. to MSJ on First Claim at 14 ("THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK.  PURCHASE OF THE UNITS OFFERED HEREBY SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN AFFORD A TOTAL LOSS OF THEIR INVESTMENT AND WHO HAVE NO NEED OF LIQUIDITY IN THIS INVESTMENT.") (quoting the September 2001 Class A Offering Mem.); *id.* ("An investment in the Shares is highly speculative and involves a high degree of risk.") (quoting the September 2001 Class A Offering Mem.); *id.* ("The Company . . . has not yet generated any operating profit.  It may not do so with the use of the proceeds of this Offering or the Company may possibly do so only after a period of time.") (quoting the September 2001 Class A Offering Mem.); *id.* at 15 ("The undersigned is aware that the Shares are a speculative investment involving a very high degree of risk and that there is no guarantee that the undersigned will realize any gain from the undersigned's investment.") (quoting the Subscription Agreement to the September 2001 Class A Offering Mem.).  The remainder of the disclaimers extracted by Milling from the September 2001 Class C Offering Mem., March 2002 Amended Class C Offering Mem., and November 2002 Class C Offering Mem. are largely identical to those contained in the September 2001 Class A Offering Mem.  *See id.* at 16-23.

[57]  *First Am. Ctr. Sec. Litig. v. First Am. Ctr. Ltd. P'ship*, 807 F. Supp. 326, 333 (S.D.N.Y. 1992) (citing *Luce v. Edelstein*, 802 F.2d 49, 57 (2d Cir. 1986)).  *Accord Time Warner*, 9 F.3d at 266 (finding that "expressions of opinion and the projections contained in the statements" were *not* affirmative misrepresentations where there were "no allegations to support the inference that the defendants either did not have these favorable opinions on future prospects

who undisputedly drafted all of the offering memoranda – knew that Cantor

recorded only net operating losses after its 2000 fiscal year, knew that Tecumseh

had recorded only net operating losses, and "failed to disclose, although he knew it

and had a duty to disclose, that neither Cantor nor Tecumseh were profitable, and

both had incurred continuing and mounting losses."[58]

      With respect to the March 2002 Amended Class C Offering Mem.,

and certainly the November 2002 Class C Offering Mem., I find the profit

projections were materially false.  This is because, halfway into fiscal year 2002,

when Tecumseh was on track to record a net loss of $852,657, it was still

circulating a profit projection of almost $8.3 million.  At that point, "[c]autionary

words about future risk [could not] insulate from liability the failure to disclose

_____

when they made the statements or that the favorable opinions were without a basis
in fact"); *Goldman v. Beldman*, 754 F.2d 1059, 1069 (2d Cir. 1985) ("Given
defendants' positive predictions and the allegations of knowledge of the
undisclosed negative factors, we conclude that the Complaint adequately stated a
claim under § 10(b) and Rule 10b-5."); *Sperber Adams Assoc. v. JEM Mgmt.
Assoc. Corp.*, No. 90 Civ. 7405, 1992 WL 138344, at *7 (S.D.N.Y. June 4, 1992)
(disclaimers did not "preclude an inference of fraud" where plaintiffs alleged that
defendant "knew or should have known at the time it prepared the projections that
the assumptions underlying the projections were false, and that, therefore, it knew
or should have known that the forecasts quite likely were incorrect when made.").

[58]    SEC Mem. at 16.

that *the risk [had] transpired*."[59]   Moreover, there is no question that a reasonable

shareholder would have considered it important, when determining whether to

invest in the Class C offering in 2002, that Tecumseh was on track to record a net

*loss* for the 2002 fiscal year.  By November 1, 2002, when that near-million dollar

loss had fully materialized, Milling still failed to disclose it to investors – while

continuing to incorporate by reference the 2001 profit projections into its offering

memoranda[60] and requiring subscribing investors to represent, warrant, and agree

that they had "received and carefully reviewed the [September 2001 Class A

Offering Mem.]."[61]   At that point, the profit projections were undeniably false.[62]

---

[59]     *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (emphasis added).

[60]     *See* November 2002 Class C Offering Mem. at 1 ("All information contained in this summary is further qualified and is in all respects subject to (1) certain information contained in the company's private offering memorandum of September 1, 2001, a copy of which may be obtained from the company upon request.").

[61]     *E.g.*, Subscription Agreement for November 2002 Class C Offering Mem. at Exhibit B, p. 1.  The Subscription Agreement further stated that "[t]he Company represents and warrants to the undersigned [investor] that, as of the date of the September 1 Memorandum, [it] will not contain any untrue statement of a material fact or omit to state a material fact in order to make the statements therein, in light of the circumstances under which they were made, not misleading as of the date thereof. . . .").

[62]     *See Time Warner*, 9 F.3d at 267 ("a duty to update opinions and projections may arise if the original opinions or projections have become misleading as the result of intervening events").

Therefore, the SEC has proven the first element of its Section 10(b) and 17(a)

claim with respect to the March 2002 and November 2002 offering memoranda.

      With respect to the September 2001 offering memoranda, even if the

projections were not "false" at that time, they were materially misleading.  Under

the so-called "bespeaks caution" doctrine,[63] "[c]ertain alleged misrepresentations in

a stock offering are immaterial as a matter of law [if] it cannot be said that any

reasonable investor could consider them important in light of adequate cautionary

language set out in the same offering."[64]  "[W]hen cautionary language is present,

[courts] analyze the allegedly fraudulent materials in their entirety to determine

whether a reasonable investor would have been misled."[65]

---

[63]    *See I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 763 (2d Cir. 1991); *Luce*, 802 F.2d at 56.

[64]    *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (citing *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 548 (8th Cir. 1997); *Gasner v. Board of Supervisors*, 103 F.3d 351, 358 (4th Cir.1996); *Saltzberg v. TM Sterling/Austin Assocs.*, 45 F.3d 399, 400 (11th Cir. 1995); *Kaufman v. Trump's Castle Funding (In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.)*, 7 F.3d 357, 371 (3d Cir. 1993)).  *Accord First Am. Ctr.*, 807 F. Supp. at 333; *Sperber Adams*, 1992 WL 138344, at *7-8.

[65]    *Halperin*, 295 F.3d at 357 ("The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.") (citing *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)).  Similarly, in order to fall within the SEC's "safe harbor," "a forward-looking statement [such as the Tecumseh profit

There is no question here that adequate cautionary language would have disclosed that – in September 2001, when the multi-million dollar profit projections were made – Tecumseh and Cantor were both operating at a loss.  Yet the disclosed "risk factors" Milling extracts from the September 2001 Class A Offering Mem. – relating to "additional financing,"[66] "dependence on management,"[67] "management experience limitations,"[68] "revenue and income

projections] must be both identified as such and 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement . . . .'" *Slayton v. American Exp. Co.*, 604 F.3d 758, 769 (2d Cir. 2010) (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)).

[66]     *See* Milling Opp. to MTD First Claim at 15 ("The Company has not yet formally commenced its new operations and therefore has not yet generated any operating profit.  It possibly may not do so with the use of the proceeds of this Offering or the Company may possibly do so only after a period of time.  Accordingly, the Company may need to arrange for other financing to develop and maintain its business should it be unsuccessful in generating adequate cash flow from operations with the proceeds of this offering.  There can be no assurance that the Company will be able to raise additional financing under such circumstances.") (reproducing the September 2001 Class A Offering Mem.).

[67]     *Id.* at 14 (disclosing that "the loss of the services of any of the Senior Executives . . . might have a material adverse impact on the Company").

[68]     *Id.* at 14-15 (disclosing that "none of [the management of the Company] has managed or controlled a firm of the prospective size and scope of the Company and there can be no assurance that they will be able to do so effectively and profitably").

22

overrides to management,"[69] and "no assurance of dividends"[70] – make no such

disclosure.  Even the statement "[t]he Company . . . has not yet generated any

operating profit" fails to adequately caution how unrealistic Tecumseh's profit

projections were because (1) it fails to disclose that the Company was currently

*losing* money and (2) it suggests the only reason the Company has "not yet

generated any operating profit" is because Tecumseh had not "formally

commenced its new operations."[71]  But those new operations – presumably,

Cantor's broker-dealer operations – were, at the time Tecumseh made this "risk

disclosure," already losing money.

Nor do Tecumseh's generic warnings – that the investment "involves

a high degree of risk" and is "highly speculative," and that only investors who "can

afford a total loss of their investment" should consider subscribing – adequately

---

[69]     *Id.* at 15.  This "risk factor" referred investors to a section called "Management-Compensation" which Milling suggests revealed that "Management compensation was minimized in that profit was not realized."  *Id.*  There is no question that this is an extremely misleading way of informing investors that, in fact, Tecumseh and Cantor were operating at a loss at the time the September 2001 Class A Offering Mem. was circulated.

[70]     *Id.* (disclosing that "*[e]conomic circumstances* may be such that there can be no assurance that cash dividends will be paid.  At the present time the Company does not anticipate paying cash dividends on the Shares in the foreseeable future.") (emphasis added).

[71]     *Id.*

caution that Tecumseh's profit projections were entirely divorced from reality or reasonable expectations for future earnings.[72]  Perhaps most importantly, the disclaimer preceding Tecumseh's actual "Projected Statements of Income" – labeled "Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995" – does not alert investors to any such incongruence.[73]  That "safe harbor statement" "discloses" that

> [a]lthough the company believes that the expectations reflected in such forward looking statements are reasonable, actual results are subject to risks and uncertainties which could cause such actual results to differ materially from those set forth or implied herein, as a result of numerous factors including without limitation sales levels, competition trends, securities market conditions, and other factors . . . .  The data further assumes the commencement of full scale and not partial business activity after procurement of capital by the Company in the approximate amount of $3,000,000, **the preponderance of which has not, as of the date hereof, been obtained by the Company.**  <u>The assumptions upon which the following projections are based are extensive and are not included herewith in their entirety but, with any other pertinent information, are available to any recipient of this memorandum upon request to the Company.</u>[74]

---

[72]     *See Halperin*, 295 F.3d at 359 (citing *Hunt v. Alliance N. Am. Gov't Income Trust*, 159 F.3d 723, 739 (2d Cir. 1998) for the proposition that cautionary language is insufficient to trigger the "bespeaks caution" doctrine where it fails to "expressly warn of or [does] not directly relate to the risk that brought about plaintiffs' loss").

[73]     *See* September 2001 Class A Offering Mem. at 53.

[74]     *Id.* (emphasis original).

These general caveats fail to reveal the material fact that Tecumseh and Cantor were actually operating at a loss at the time Tecumseh was projecting first-year profits of over $8 million, second-year profits of over $12 million, and third-year profits of over $17 million – information that "would have been viewed by the reasonable shareholder as having significantly altered the 'total mix' of available information."[75]  Milling's "established omissions" in the September 2001 Class A Offering Mem. would have been "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality."[76]   And because the profit projections were both attached to and incorporated by reference in the September 2001 Class C Offering Mem. – from which Milling extracts "cautionary language" just as inadequate as the cautionary language discussed above – the SEC has satisfied the first element of its Section 10(b) and 17(a) claim with respect to the September 2001 offering memoranda as well.

### b.  Dividends and Returns on Investment

The SEC also alleges that the Class C offering documents (dated September 25, 2001, March 5, 2002, and November 1, 2002), as well as a letter from Milling to Class C shareholders on July 11, 2003, were false and misleading

---

[75]     *Basic*, 485 U.S. at 235.

[76]     *Id.* (quotation marks and citation omitted).

in their description of the Class C quarterly distributions as "ROIs" or "dividends," because they failed to disclose to investors that Cantor and Tecumseh had actually been losing money and that any profit-derived dividends were highly unlikely.[77] Characterizing the quarterly distributions in this way "implied that Tecumseh, along with Cantor, was a profitable enterprise with earnings to distribute to investors when in fact both Tecumseh and Cantor had incurred substantial losses."[78]

To counter these accusations, Milling again points to statements extracted from various offering memoranda for the Class C shares. For example, the 2001 Class C Offering Mem. stated that "[w]ith respect to the amount of Cantor's net trading profits, if any, from which these ROI's are intended to be derived, and the effect of these amounts, if any, on the amounts distributed to Investors, no guarantees or assurances of any kind can be made."[79] However, "simply stating that there is no assurance Tecumseh will pay dividends is insufficient to advise investors of the risk that Tecumseh's so called 'dividend'

---

[77]    *See* SEC Mem. at 7.

[78]    *Id.* at 14.

[79]    Def. Opp. to MSJ on First Claim at 17.

26

payments were not truly dividends but instead returns of investor capital."[80]  Thus,

Milling's failure to disclose the source of the distribution made for the last calendar

quarter of 2001 – which the March 2002 Amended Class C Offering Mem.

confirms was made[81] – constituted an actionable omission.

> The March 2002 Class C Offering Mem., however, cautioned that
>
> > [w]hile a significant gauge of the amounts of distributions to Investors by Tradevest is intended to be the amount of the trading profits of Cantor, this amount will not govern the amounts of such distributions, particularly in light of the circumstance that the expanded Cantor trading departing is et [*sic*] in its formative stages.  Accordingly, the distributions to Investors will not necessarily be indicative of trading profits of Cantor.[82]

The memorandum further explained that "[t]o the extent that distributions are not

made out of Cantor trading profits, Tecumseh will pay over to Tradevest, from its

general funds, the amount of such distribution for the account of Tradevest."[83]  It

also repeated the cautionary language contained in the September 2001 Class C

Offering Mem., namely that to the extent the ROIs would "eventually" be derived

---

[80]     SEC's Reply to Defendant's Submissions in Opposition to SEC's Motion for Summary Judgment at 4.

[81]     *See* Def. Opp. to MSJ on First Claim at 18 (reproducing the March 2002 Amended Class C Offering Mem.).

[82]     *Id.*

[83]     *Id.*

27

from Cantor's net trading profits, "no guarantees or assurances of any kind can be made."[84]   The November 2002 Class C Offering Mem. contained largely identical warnings, with additional caveats that "[t]here can be no assurance that the Company will continue to pay dividends at [the rate it had been paying them]."[85]

Although I find the cautionary language in the March 2002 and November 2002 offering memoranda to bespeak somewhat more caution than that contained in the September 2001 memorandum, Tecumseh's continual use of the word "dividend" and "return on investment" or "ROI" to describe its quarterly distributions – not to mention its description of such distributions as "dividend payouts" on the very checks on which they were issued – was unquestionably misleading.   Black's Law Dictionary defines a "dividend" as "[a] portion of a company's *earnings or profits* distributed pro rata to its shareholders, usu[ally] in the form of cash or additional shares."[86]   It defines a "fair return on investment" as

---

[84]     *Id.*

[85]     *Id.* at 21 (reproducing the November 2002 Class C Offering Mem.).

[86]     Black's Law Dictionary (9th ed. 2009) (emphasis added).   Milling does not argue that I should (or could) ascribe a different meaning to "dividend" than its ordinary meaning.   Moreover, when asked during his deposition what a "dividend" and "return on investment" were, he asserted his Fifth Amendment privilege.   *See* 7/27/10 Transcript of Deposition of John Milling, Exhibit R to Arnold Decl., at 25-26.

"[t]he usual or reasonable *profit* in a business . . . ."[87]   Although Milling

occasionally used the word "distribution" in lieu of "dividend" in the offering

memoranda, he never completely eliminated use of the word "dividend."[88]

More importantly, even the cautionary language strongly suggests that

at least *part* of the "distributions" were and would be profit-derived – *i.e.*, "a

significant gauge of the amounts of distributions . . . is intended to be the amount

of trading profits of Cantor" and "the distributions . . . *will not necessarily be*

*indicative* of trading profits of Cantor."   Buried in a paragraph on "Payment of the

Investors' Return on Investment" in the March 2002 memorandum is a statement

that "[t]he ROI on all investments . . . with respect to the period subsequent to

October 1, 2001, is intended to be derived from the *general funds of* Tecumseh."[89]

However, the sentence immediately following describes how distributions are to be

made "[t]o the extent [they] are not made out of Cantor trading profits."[90]

---

[87]     *Id.* (emphasis added).

[88]     Even the word "distribution" in this context suggests profits or
earnings.  For example, Black's Law Dictionary defines a "corporate distribution"
as "[a] corporation's direct or indirect transfer of money or other property, or
incurring of indebtedness to or for the benefit of its shareholders, *such as a
dividend payment out of current or past earnings*."  *Id.* (emphasis added).

[89]     Def. Opp. to MSJ on First Claim at 18 (reproducing the March 2002
Amended Class C Offering Mem.) (emphasis added).

[90]     *Id.*

Informing investors that their quarterly "distributions" – intermittently referred to as "dividends" or "ROIs" – might be paid out of a "general fund" falls far short of disclosing a piece of information that would be "obviously important"[91] to investors: "that the distributions could not have been paid from earnings (which were non-existent)."[92]  Milling omitted such disclosures from these memoranda, from his July 2003 letter to investors, and from the checks he signed to investors making such quarterly distributions.  "Anayz[ing] the [memoranda] in their entirety" – especially taking into account the misleading profit projections incorporated by reference into each of them – I conclude as a matter of law that "a reasonable investor would have been misled"[93] by these documents' description of the Class C quarterly distributions.

### c.   The Cantor Acquisition

Finally, Tecumseh's offering memoranda and other communications with investors repeatedly stated that NASD approval of Tecumseh's acquisition of Cantor was "forthcoming," failing to disclose that no such application for approval had been submitted to or was pending before the NASD before May 2003.  Milling

---

[91]   *TSC Indus.*, 426 U.S. at 450 (quotation marks omitted).

[92]   SEC Mem. at 16.

[93]   *Halperin*, 295 F.3d at 357.

offers no "commentary" or "extracts" (or evidence) in response to the SEC's argument that such omissions were materially misleading.  It is undisputed that Milling knew there was no NASD application on file – an application he was responsible for submitting as counsel for Cantor.  And there is no question that "NASD approval was a condition of Tecumseh's ability to legally operate Cantor as a wholly-owned subsidiary, and Tecumseh's future was promoted as dependent on a combination with Cantor."[94]  Therefore, I conclude that "'disclosure of the [fact that NASD approval of Tecumseh's acquisition with Cantor was not "forthcoming"] would have been viewed by the reasonable shareholder as having significantly altered the 'total mix' of information available.'"[95]  Accordingly, I find Milling's failure to disclose this fact a material omission.

### 2.      "In the Offer and Sale" and "in Connection with the Purchase and Sale" of Securities

The materially false and misleading misrepresentations and omissions concerning the profit projections, Tecumseh's dividends, and the NASD's approval of the acquisition of Cantor were all made "in" and "in connection with" the offer, purchase, or sale of securities because they were all included in the offering memoranda (drafted by Milling) for the Tecumseh securities, which were

---

[94]      SEC Mem. at 16.

[95]      *Basic*, 485 U.S. at 232 (quoting *TSC Indus.*, 426 U.S. at 449).

distributed to investors in order to persuade them to purchase the securities of Tecumseh.

### 3.    Scienter

The SEC argues that Milling knowingly or recklessly made the false and misleading statements described above, or knowingly or recklessly omitted to state material facts pertaining thereto.  To the extent Milling's submission in opposition can be considered a "good faith defense," it fails.  Milling was a senior officer at Tecumseh.[96]  He wrote the offering documents and authorized their distribution to investors to solicit interest in the private placements.[97]  Milling admits that he knew that Tecumseh recorded only operating losses[98] and that Cantor recorded only operating losses after its fiscal year 2000.[99]  He was responsible for submitting an application for approval of the Cantor acquisition to the NASD.[100]  This undisputed evidence therefore proves that Milling knew or was reckless in not knowing that the Tecumseh income projections given to investors were baseless; that neither Cantor nor Tecumseh had any earnings, and both

---

[96]    *See* 56.1 ¶ 1.

[97]    *See id. ¶* 2.

[98]    *See* Amended Admissions *¶* 4 (56.1 ¶ 26).

[99]    *See id. ¶* 5 (56.1 ¶ 26).

[100]    56.1 ¶ 39.

recorded only net operating losses; that Class C investors were being paid quarterly distributions from investor capital, not earnings; and that no NASD application for approval of the Cantor acquisition was pending with the NASD before May 2003. As the principal officer of Tecumseh orchestrating the sale of its securities, Milling either knew or was reckless in not knowing that the information provided to investors was materially false and misleading.  Therefore, the SEC is entitled to summary judgment on its claim that Milling violated the Antifraud Provisions of the federal securities laws.

### B.    Aiding and Abetting Claim

In *Tecumseh I*, I found the evidence before the Court "insufficient to establish that Milling substantially aided Cantor's alleged violation of Section 17(a)," and directed the SEC to "inform the Court if it has any additional evidence to submit that would create a genuine issue of material fact as to whether Milling aided and abetted a violation of Section 17(a)."[101]  I denied summary judgment to the SEC and indicated my intention to grant summary judgment in favor of Milling if the SEC was "unable to produce any such evidence."[102]  Because the SEC has produced no new evidence in support of its renewed motion for summary judgment

---

[101]    *Tecumseh I*, 2009 WL 4975263, at *5.

[102]    *Id.*

on this claim,[103] I grant summary judgment on this claim in favor of Milling.

## C.     Damages

### 1.     Injunctive Relief

The SEC asks that I enjoin Milling from engaging in future violations of the securities laws.[104]  For the same reasons I granted that request in *Tecumseh I*,[105] and because the degree of scienter involved in Milling's violation of the Antifraud Provisions of the federal securities laws is significant,[106] I grant it once again.

_____

[103]     Instead, the SEC merely rephrases one of its arguments for why Milling provided the requisite "substantial assistance" to establish aiding and abetting liability:  Instead of arguing that "in acting as counsel to Cantor in connection with [an earlier investigation by the NASD] into Cantor's compliance with record keeping and authorization requirements[,] . . . Milling should have advised Cantor to record the transactions, but instead did nothing to ensure that Cantor was in compliance with the requirements," SEC PSJ Mem. at 12, it now argues that "in acting as Cantor's counsel in the NASD investigation of its compliance with NASD Rule 3040, Milling assumed the duty to advise his client of its responsibilities under that Rule," SEC Mem. at 20.

[104]     *See* SEC Mem. at 22-23.

[105]     *See* 2009 WL 4975263, at *5.

[106]     *See SEC v. Colonial Inv. Mgmt. LLC*, No. 09-3503-cv, 2010 WL 2500386, at *4 (2d Cir. June 17, 2010) ("'the degree of scienter involved'" is a factor to be weighed in a court's totality of the circumstances approach to determining whether to issue a permanent injunction) (quoting *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 100 (2d Cir. 1978)).  I also note that Milling "'continues to maintain that his past conduct was blameless.'"  *Id.*

### 2.    Civil Penalties

The SEC also requests that I impose "third-tier" civil penalties.[107] Third-tier penalties may be imposed to punish a violation involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" if the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."[108]  Such penalties cannot exceed the greater of $110,000 per violation for a natural person[109] or "the gross amount of pecuniary gain to such defendant as a result of the violation."[110] Weighing the same factors I considered when determining whether to impose first-tier civil penalties in *Tecumseh I*[111] – the same factors a court weighs when determining whether to award injunctive relief[112] – I conclude that the imposition of a civil penalty is appropriate in this case:  Milling has now been found in violation of the federal securities laws' Antifraud Provisions, violations that were

---

[107]    *See* SEC Mem. at 23-24.

[108]    15 U.S.C. § 77t(d)(2)(C).

[109]    *See id.*; 17 C.F.R. §§ 201.1001, 201.1002,

[110]    15 U.S.C. § 77t(d)(2)(A).

[111]    *See* 2009 WL 4975263, at *6.

[112]    *See SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007).

"particularly egregious because, having been a securities lawyer for more than 40 years, he gained the trust of investors and then abused that trust by repeatedly making materially false and misleading statements and omissions to them."[113] Moreover, investors suffered substantial losses through the fraudulent offerings – more than ten million dollars.  However, because the SEC has not provided any evidence of the total amount of pecuniary gain Milling personally received from the sale of unregistered securities; because Milling has already been held jointly and severally liable for the entire amount of Tecumseh's ill-gotten gains; and because of his advanced age and deteriorating health, I find a civil fine of $110,000 adequate to punish Milling and deter future violations.

## IV.   CONCLUSION

For the aforementioned reasons, the SEC's motion for summary judgment is granted with respect to its claim that Milling violated Section 10(b) and Rule 10b-5 of the Exchange Act and Section 17(a) of the Securities Act, and Milling is enjoined from future violations and ordered to pay third-tier civil penalties of $110,000.  Summary judgment is granted in favor of Milling with respect to the SEC's claim that he violated Section 17(a) of the Exchange Act and Rules 17a-3 and 17a-4.  The Clerk of Court is directed to close this motion (Docket

---

[113]    SEC Mem. at 24.

No. 121) and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            January 18, 2011

**- Appearances -**

**For the SEC:**

Nancy A Brown, Esq.
Securities & Exchange Commission
3 World Financial Center, Room 4300
New York, NY 10281
Tel: (212) 336-1023
Fax: (212) 336-1322

**For Defendant (Pro Se):**

John L. Milling, Esq.
Milling Law Offices
115 River Road
Building 12, Suite 1205
Edgewater, NJ 07020
Tel: (201) 869-6900